YARDLEY & CO., LTD., ET AL. *v.* UNITED STATES (No. 4720)[1]

United States Court of Customs and Patent Appeals, June 3, 1953

*Brooks & Brooks (Frederick W. Brooks* and *Thomas J. McKenna* of counsel) for appellants.

*Charles J. Wagner*, Acting Assistant Attorney General *(Richard E. FitzGibbon*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn (Albert MacC. Barnes* and *Eugene F. Blauvelt* of counsel) *amicus curiae.*

[Oral argument February 10, 1953, by Mr. McKenna, Mr. FitzGibbon, Mr. Blauvelt, and Mr. Barnes]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, pursuant to its decision, C. D. 1371, overruling

---

[1] C. A. D. 533.

the protest of appellants against the assessment of duty on glass perfume bottles at the rate of 75 per centum ad valorem,[1] under paragraph 218 (e) of the Tariff Act of 1930, as bottles produced otherwise than by automatic machine.

The importers, Yardley & Co., Ltd., et al., hereinafter referred to as appellants, claimed the involved merchandise to be properly dutiable under the same paragraph but at the rate of 25 per centum ad valorem as bottles "produced by automatic machine."

The pertinent portion of paragraph 218 (e) reads as follows:

Bottles and jars, wholly or in chief value of glass, of the character used or designed to be used as containers of perfume, talcum powder, toilet water, or other toilet preparations; * * * all the foregoing *produced by automatic machine*, 25 per centum ad valorem; *otherwise produced*, 75 per centum ad valorem. * * * (Italics ours.)

That the judicial interpretations of the above paragraph have been attended with no little difficulty is apparent from an examination of the decisions relating to the controversies which have arisen thereunder.

The same paragraph was involved in the cases of *United States* v. *Jos. Riedel Glass Works, Inc.*, 32 C. C. P. A. (Customs) 201, C. A. D. 307, and *Griffon Importing Co.* v. *United States*, 36 C. C. P. A. (Customs) 121, C. A. D. 408.

In the *Riedel* case, *supra*, the Customs Court found that the bottles therein were produced by "automatic machine" despite the contentions of the Government that since the raw material, molten glass, was there supplied to the machine manually instead of being supplied automatically, that the machine was not automatic; that to be automatic it must be fully and not partly or semi-automatic. The judgment therein was affirmed by this court.

Subsequently the *Griffon* case, *supra*, came before the Customs Court. In that case the court found that the machine in the *Riedel* case was unlike the machine involved in the *Griffon* case and that the record in the latter reflected a complete absence of the automatic features of the machine in the *Riedel* case. The bottles were therefore held to have been "otherwise produced." That decision was rendered by a majority of the Division with one judge dissenting. On appeal here the judgment was reversed, two judges dissenting.

We have examined with care the records, opinions, and briefs of the instant controversy, as well as those of the prior cases, and from such examination it appears that great stress has been laid upon determining Congressional intent as such intent might be disclosed by the legislative history of the paragraph. It is so well established as to require no citation that resort to legislative history is not necessary when the

---

[1] In some entries the assessment was made under the same paragraph as modified by the Trade Agreement with Czechoslovakia, T. D. 59456, at 37½ per centum ad valorem.

language of a statute is clear and unambiguous. Since, in our opinion, the language of the controlling paragraph clearly meets those standards, resort to legislative history in the application of its provisions is not necessary here nor do we believe it was necessary in the two preceding cases.

However, before applying that conclusion to the present facts, it is necessary to discuss various phases of the proof offered relative to the characteristics of the bottle-making apparatus involved here and the methods by which the imported bottles were produced.

It is, of course, fundamental in customs law that when the classification of the collector is challenged, the dual burden of proving that such classification is incorrect and that its own claimed classification is correct, rests upon the importer.

In attempting in the instant case to discharge that burden before the Customs Court, the importer, by stipulation, incorporated the entire record of the *Griffon* case and rested. The Government, in an effort to present a more elaborate and detailed record than that presented in the *Griffon* case, called five additional witnesses and introduced a number of exhibits in evidence. Those exhibits included photographs of the machine, commonly known as the Schiller-type bottle-making machine, involved here, samples therefrom of a bottle in various stages of production, models of the moulds, and also a motion picture in color which showed in operation the Schiller-type machine as well as a "fully automatic bottle-making machine."

The evidence offered by the importer in the incorporated record is a deposition of one John Arthur Maier, Managing Director of the International Bottle Co., Ltd. of London, England, which concern shipped the imported goods involved in both the *Griffon* case and here. His testimony to the effect that the Schiller-type machine was automatic is shown by the following questions and answers found in certain of the interrogatories:

How does the glass get into the mould or machine?

Molten glass is transferred, by a gatherer using a solid gathering iron, from the furnace to the parison mould to which are fitted the neckring moulds.

What takes place immediately following the introduction of the glass?

No. 1 Operator cuts off sufficient glass which, by means of vacuum created by continuously working pumps to which the machine is connected, is automatically sucked into the neck moulds. This operation forms the aperture, the brim and the external shape of the neck of the bottle.

How [is] the quantity of glass * * * fixed or determined?

The quantity of glass is largely determined by the size or capacity of the parison mould and also partly by the point at which the operator cuts the glass from the gathering iron.

How [is] the quantity of air to blow each bottle * * * fixed or determined and what is its source of supply?

Compressed air, supplied from power driven compressors, is released through a control valve to blow the internal shape of the neck and the parison form. The parison form is determined by the shape of the parison mould.

What further operations are necessary to complete the production of the bottles or jars?

The neckring moulds in their spring loaded holders, supporting the partly formed bottle, are transferred (by No. 1 Operator) to the blow or finishing mould. No. 2 Operator lowers the blow head thereby releasing the valve which controls the compressed air supply. The bottle is then automatically blown to the shape of the finishing mould. The finished bottle is removed from the mould by No. 2 Operator who compresses the spring of the neck mould holders, automatically ejecting the bottle on to the table of the machine. From this point the bottle is carried to the annealing lehr.

To secure a more detailed picture of the operation of the Schiller-type machine, we quote at length from the description contained in the majority decision below.

* * * To avoid confusion, we refer to the 3-man team as the gatherer, operator No. 1, and operator No. 2, even though in some of the testimony they are referred to as operators Nos. 1, 2, and 3.

The molten glass is gathered on the end of a solid rod (punty) by one member of the 3-man team, called the gatherer. The molten mass so gathered is removed from the furnace by the gatherer who holds it over the first (parison) mold.

Sitting before the parison mold, operator No. 1 inserts a neckring mold into the bottom of the parison mold previously opened by him. He then lowers a funnel over the top of the mold to guide the glass into the mold. Using shears, he then cuts off sufficient glass to make the bottle being manufactured. This gob of glass falls into the mold. The operator then raises a plunger in the neckring, lowers the blowdown head down over the mold, and admits compressed air which forces the glass down around the plunger. He then lowers a baffle plate down on the top of the mold. He then releases compressed air into the mold through the neckring, and finally returns all movable parts to their original positions and opens the mold. Each and every one of the multiple operations above described is accomplished by operator No. 1 by means of various levels all operated by hand. *No single movement or operation is performed by the machine itself.* When the above-described activities of operator No. 1 are completed, and he has opened the parison mold, he removes the neckring mold, with the partly formed bottle in it, and transfers it manually to the finishing mold operated by his co-worker (operator No. 2) seated beside him.

This second operator (No. 2) meanwhile has opened one of the two finishing molds before him to receive the partly formed bottle transferred to him by operator No. 1. The finishing mold operator (No. 2) has two finishing molds which he uses alternately for speed of operation and to permit each bottle to cool sufficiently to keep its shape when removed. When the partly finished bottle in the neckring mold is placed in the finishing mold, the operator closes the mold and locks it in position. He then moves the blowhead down on top of the mold and introduces compressed air into the mold. This blows the bottle to its finished shape. He then shuts off the air, raises the blowhead, opens the mold, and removes the completely formed bottle from the mold by means of the handles on the neckring mold. By compressing the handles of the neckring mold, the bottle is ejected and placed on a conveyor belt by means of which it is carried to the annealing oven (lehr). All these operations are performed by operator No. 2 by means of hand levers or foot pedals.

The majority of the Customs Court held that in the light of the augmented record of the instant case there was no doubt that the

Schiller-type machines which produced the involved bottles were neither "fully automatic" nor "semi-automatic" and could not, even by the most flexible application of the doctrine of Congressional intent, be held to be automatic machines. The crucial issue here, therefore, is whether the Customs Court committed error, as alleged by appellants, in so holding.

It is a well settled rule of law that Congress generally intends that the usual and ordinary meaning shall attach to the language used in the statutes. Thus we cite here from Webster's New International Dictionary, Second Edition, 1936, the same definition of an automatic machine that was cited with approval in the *Riedel* case.

A machine or machine tool which, after once being set, operates automatically *except for applying the power, lubrication, supplying material, and shutting off the power.* (Italics ours.)

That definition is consistent with those we have found in other recognized references and court decisions. For example, in Corpus Juris Secundum, Vol. 7, p. 1296, is found the following:

AUTOMATIC. Self-acting, or the elimination of human agency or volition, which results in the saving of labor and increases certainty and uniformity of operation; having an inherent power of action or motion, self-acting or self-regulating, not voluntary, not depending on the will, mechanical.

AUTOMATICALLY. Acting without the continued application of human agency or volition, that is, as opposed to acting rationally or volitionally; of its own accord; self-acting.

Likewise, in the case of *American Roll Gold Leaf Co. et al.* v. *W. H. Coe Mfg. Co. et al.*, 212 Fed. 720, (C. C. A. 1st 1914) the court stated:

The word "automatically," as applied to mechanism, is in common use and is unambiguous. It means "self-acting," and it implies a certain cycle of movements which the machine itself makes without outside control. This cycle may be simple or complex. In the development of many machines there can be traced a constantly increasing extent of automatism; by which is meant that many steps or processes, which formerly had to be started, stopped, or controlled by the operative, are now started, stopped, or controlled by the machine itself. \* \* \*

While it may be, as observed by the majority in the *Griffon* case, that the word "automatic" is sometimes used in a relative sense, we can not bring ourselves to the conclusion that the facts herein can properly justify our attaching any other meaning to the word than we have set out above. It is to be noted that the paragraph does not say "semi-automatic" or "partly automatic," but simply "automatic."

As a matter of fact, it is our belief, as found by the majority below, that the word "automatically," as used in the deposition of the witness for the importer, is not completely accurate. For example, the glass is not "automatically sucked into the neck moulds" because it is the action of the operator which performs that function; the bottle is not "automatically" blown by machine because the operator himself

manually controls the compressed air and injects it into the mould which, in turn, blows the bottle. If left to the machine alone, no air would enter and no bottle would consequently be blown. Moreover, the finished bottle is not "automatically" released or ejected from the mould but the mould itself is opened by the operator and the bottle is removed by hand.

Under the definitions given above, and the clear wording of the paragraph, we are of the opinion that the machine which produced the instant bottles was not an automatic machine. While we have used the word "machine" in reference to the Schiller apparatus, we do not believe it necessary to hold here specifically that it is such a device. Even if it could properly be held to be a machine, it clearly is not automatic.

Appellants urge that the facts in the instant case are so similar to the facts in the *Griffon* case that the doctrine of *stare decisis* requires reversal of the judgment of the Customs Court. We do not agree with that contention. See *Shell Eastern Petroleum Products, Inc.* v. *United States*, 28 C. C. P. A. (Customs) 155, C. A. D. 138, and Corpus Juris Secundum, Vol. 49, sections 186, 187 and 193.

The other assignments of error advanced by appellants have been considered but in view of our conclusion it is not necessary to discuss them.

The judgment appealed from is hereby *affirmed*.

Garrett and O'Connell, JJ. dissent.

William P. Cole, Jr., Judge, having participated below, disqualified himself to sit in this case and Jackson, Judge, retired, was recalled to participate herein.